Good morning, counsel. Good morning, Your Honors. May it please the Court, Mary Ann Dugan for the Plaintiffs' Appellants. If possible, I would like to reserve five minutes for rebuttal. All right. I know there are many, many issues on this appeal, and so if you have a preference as to where I should start. What's your best claim or claims? Oh, what's the best claim? Okay. Well, I think that because excessive force is almost never amenable to summary judgment, that claim is probably the strongest appeal issue. Well, why almost never? I'm not so sure I agree with you. Why do you say almost never? You know, I'm from the district court, and I certainly have granted summary judgment on that issue, and it's less certainly than the circumstances where I've required a trial. Well, for two reasons. One is because there's so much case law regarding excessive force, and in this case specifically about handcuffing and the nature of the handcuffing. And the second reason is because it is almost always a disputed issue of fact. Tell me about the facts here that establish undisputed issue of fact that would go back to the trial court and a jury would have to make that determination. Ms. Strong alleged that she was handcuffed unnecessarily and unnecessarily long and overly, in a way that injured her, because the officers were advised she had had shoulder surgery. And in this case, in the case of Meredith v. Arath in 2003, this court specifically addressed cuffing a nonsuspect during a lengthy search, which is the situation we have here. Ms. Strong was not a suspect. It's an unusual case because the raid was conducted at her home, even though she was not a suspect. Her boyfriend was the suspect in the motorcycle. Is there any indication of injury or her shoulder condition being exasperated in the record? Yes, she herself alleged injury, and she, of course, is the one who knows what she experienced personally. And that is the information that is in the record at this point. But at some point they actually took off the handcuffs after she had said, okay, so why isn't that enough? Because handcuffs obviously are to restrain somebody from engaging in or causing harm to the police officers and I guess other reasons, too. But so they did at some point release her. Why, on the basis of the facts, was it not soon enough that would require that this matter go to the jury? Well, that's a quintessential issue of fact as to how long it actually was and whether it was promptly relieved after they were notified of her shoulder injury, which she alleges was not the case. But not the case. What does she say? What does she say that the jury would find in her favor? That there was a delay, an unreasonable delay between the time they were informed of the injury and the time that her handcuffs... That's a conclusion. And I will reiterate that in Meredith, this court said that in the future after Meredith, there would be no qualified immunity regarding handcuff detention during a search of a... Handcuffing of a non-suspect with a non-violent crime, which this was, no flight or interference attempted, no indication of any desire to not cooperate. And so qualified immunity would not be appropriate. And this case should have gone to the jury on the cuffing. And regarding qualified immunity, I know the defendant did raise that, or defendants in a 28J letter citing the recent Kissela case from the Supreme Court. I did not respond because it was a very general statement, and this was basically already briefed. But that case involving the shooting of a woman who was holding a knife was a very unusual situation requiring quick thinking by the officers and no actual case cited exactly on point. And here we had cited on the cuffing, the Meredith Bierath case, the Wall case, many, many cases on the seizing of non-suspect's property and established that that's, you can't just seize people's property, that isn't even the subject of a warrant. And the unreasonable amount of property destruction, using a tank to mow down the fence and the gate for a property crime, no violence. Let me ask you this, though. Wasn't it also clear that they did not know that it was unlocked? That the door, whatever you want to call it, came through the gate? That may be an issue of fact, whether they knew, what they knew and when they knew it. There's a lengthy dossier. This place was surveilled before they came in with a SWAT team. But if in fact they did not know that, do you have reason in the record to establish that they did? Well, whether they did or not, to then proceed to destroy property unnecessarily inside the home, which is alleged. Isn't that, once again, that's a very conclusion. It's a legal conclusion, unnecessarily. So you have to take all the undisputed facts, and that's one that, don't you think, is rather important? I think that it's not a legal conclusion as to what amount of property damage is required to carry out this particular search of a non-violent crime in a non-suspect's home. If that were subject to summary judgment, then police would be given free reign to carry out these before-dawn searches of non-violent crimes in a non-suspect's home, destroy their property, and never get to the jury. All right, let me ask you this. What facts do you agree they knew at the time this took place? Didn't they have some reason, reasonable facts, in order to take the action they did? And I'm just asking you, since you're at your position that it was unreasonable, tell me, argue for, you know, you have to accept these facts. Well, first of all, let me clarify, my position is that a reasonable jury could find... No, I know, but we have to start from what the facts are. So you have to take all the undisputed facts that would be offered by the State as to what happened. And so what information is undisputed that they knew as the basis for them taking the action they did? They had numerous facts, some exonerating and some implicating that a son who no longer lived there had been violent in the past. There were no crimes. No, he no longer lived there? They had that information available to them through... They had no evidence he lived there at the time. It wasn't his DMV address. The information they had was quite old. They knew that these people who did live there, well, Ms. Strong and her boyfriend who stayed there, had no violent criminal background, and they knew that they were investigating a nonviolent crime. Again, we're not trying to overturn a jury verdict. We are trying to get back to where we get to talk to the jury, give them these facts... I know that, but what you have to do is we're dealing with a decision that's made on... And the court, of course, the trial court, the district court, would have to make the decision that there were no undisputed facts, and on those no undisputed facts, that the decision was supported. So I'm asking you to take the undisputed facts that were offered by the state or by the city, and why those undisputed facts established that there is a reason for it to go to the jury. Because the undisputed facts showed no violent crime on the part of the people who actually lived in the home. It was an investigation of a nonviolent crime. But that doesn't mean that there weren't legitimate safety concerns. Of course. And that's why the balance... I think that's what Judge Silver was trying to focus on, taking the undisputed facts of the safety concerns, the potential for violence, why was this still excessive? Or why are there sufficient material issues of disputed fact to go to the jury on the question of excessive force or excessive violence? Damage of property. Well, in U.S. v. Becker, this court held that one does have to balance the amount of property destruction that is used. And in other cases, and the name is escaping me, but that SWAT itself can be excessive force. If we allow these cases to be taken from the jury, any time a police officer says, we needed to use a tank, two dozen officers, and destroy armoires and interior furniture in the home to look for evidence of a nonviolent crime, and a very leisurely search, by the way, not a quickly evolving situation as with the Casella case, then we're giving the officers carte blanche to carry out these SWAT raids against citizens' homes. Ms. Strong, did the complaint identify specifically who handcuffed Ms. Strong? No, because at the time of drafting the complaint, we were not clear on who had done that. Ms. Strong didn't know, and so in the complaint at pages 30 and 31, or 31 to 32, we listed all of the officers who were named or listed in the SWAT file, and of course none of them said, and I'm the one who handcuffed them. Right. And what about destruction of the furniture? Did the complaint specifically allege who destroyed the furniture? No. So in paragraph... I just was, I just wanted to make sure that that was, that my recollection was correct, that there was no one specifically identified as being the suspect. In paragraph 10, we said that all of these officers we've listed, if they're on notice, if they participated in handcuffing Plaintiff Strong, in deciding to keep her handcuffed, or in damaging the property, plaintiff may later move to amend the complaint to add them to the complaint. So there's that issue regarding the John Does, and then there's the issue of the integral participation of the officers who drafted the search report. Counsel, you have to show direct involvement in the handcuffing, don't you, and or the destruction of property. Just drafting the affidavit doesn't get you there in terms of an excessive force or property destruction claim, does it? Two things. One, Soulsby and Trotter and Burroughs all together decided to, Soulsby made the decision, but with the assistance of Trotter and Burroughs, as this Court said by itself, can be excessive force. And then the... Not always. No, right. Of course not. But in this case, let's look at the facts. Why? Okay. Can I finish? I'm almost done. So the second thing I was going to say is that, sorry, Burroughs was the super, he was the case agent for the search. But that's not enough for individual liability on an excessive force claim. Well, this Court has stated in Boyd and in Blankenhorn, even in the absence of physical contact, an officer can be held liable for integral participation if they participate in a search knowing that excessive force is going to... Did they participate in the search, Burroughs and Soulsby? Did they participate in the search? Burroughs and Trotter were present and Burroughs was the, as I recall, either Burroughs or Trotter, I think it's Burroughs was the supervising agent during the search. Okay. What could they have done and should they have done to ensure that there was no excessive force? So didn't they have reason to believe prior to the search that there was potential violence and danger? Didn't they? In resolving how this search was to be conducted? Well, two things. I would argue, Your Honor, that the information that they included that indicated violence was not credible as far as it being a present danger. But even if it were, that is still an issue of fact as to how much force... Okay. Let me ask you, are you saying as a matter of law it was not credible, that they, it's a matter of law that they were not telling the truth? They weren't telling the truth about the son who had a criminal record, violent record living there at the time. That was not accurate. I think the problem is that there's very little to kind of controvert the officer's articulation of safety concerns, but you're running low on time. There's one additional issue that I wanted to give you a brief opportunity to address and that's the seizure of motorcycle parts at the shop, for which there was no warrant. And as I understand the record, that seizure included parts belonging to customers as well? Correct, Your Honor. And those were held for, if I recall correctly, over a year. Ms. Strong's motorcycle was held for two months, but the non-resident customer's parts were held for over a year. Mr. Byers was, he states that he was not aware of the fact that there were motorcycle parts there. He was under duress to sign over those parts. He told the officers that those motorcycle parts belonged to customers at the time that the parts were seized? But then he consented to the seizure anyway. Yes. And I think what's in the record is the forms for the orders from those customers were part of what was seized by the officers. And he says that he was told he would be arrested if he didn't consent to turning over those items. Now, whether he can actually give consent for some property that isn't his to be seized, arguably without a warrant, because there's no indication in the warrant that any parts or motorcycles were to be seized other than Mr. Byers. He did say as a matter of law that he did not have the authority to give consent when they were not his and that he was, as a matter of law, he was under duress and that duress was, as a matter of law, was, first of all, he was under duress and that he should not have been so that there was no consent by law? Well, so I'm not asking for summary judgment on that issue, but yes, I would argue that he only has the authority to hand over the amount of control he has, obviously, he can't... What about apparent authority? If he didn't have actual authority, why didn't he have apparent authority? Well, there's no evidence he was perceived as their agent. The engines were there in the shop, he was the bailey at a minimum. He was a bailey, which is different than an agent. Well, perhaps, but to a reasonable police officer, would it have been reasonable to assume that he had apparent authority to give consent? I don't think so. And that wasn't briefed below, it wasn't raised below. I think that would be an extreme argument to say that somebody who is simply holding something to repair it now is reasonably perceived as that person's agent so they can, you know, sell it or, you know, let people use it. I mean, that wasn't an argument that was made. All right, counsel, you've exceeded your time. We'll give you a minute for rebuttal. May it please the Court, my name is Ben Miller. I'm one of the city attorneys for the City of Eugene and the individual defendants. In this case, the district court correctly granted summary judgment on the excessive force claim for at least three different reasons. First, the individual defendants that were named here, Lieutenant Soulsby, Officer Trotter, and Detective Burroughs, were not involved in the actions that plaintiffs complained about. Well, they established what the procedure would be for the search, right? Lieutenant Soulsby played a role there in determining what the operations plan overall would be. And under his declaration, the search proceeded according to the operations plan. But none of them had any role in He was present. He was present, but he served in a perimeter position covering a trailer that was also on the property. If there had been excessive force, and would he have had an obligation to step forward and make sure that it did not occur? Yes. I mean, if he had observed excessive force, he would have had an obligation to step forward and make sure it doesn't occur. Did he observe what was occurring? No. And it's in Supplement of Excerpt, I think, 64. In his declaration, he states that he played no role in handcuffing them or deciding how to handcuff them. He never entered any of the houses. He never damaged any property. His declaration makes very clear that his role was not to engage with the individuals that were coming out of the house. All right. So then would it be his position that they exceeded what he had established were the guidelines for that search? Well, taking the facts in light most favorable to the plaintiff, they claim that after they were called out, initially Ms. Strong was handcuffed too tightly, she complained, and her handcuffs were loosened. Later, she was then placed in double handcuffs, so two sets of handcuffs to make it even more comfortable. It was January, so it's a cold time of year in Oregon. They're put into the back of the crisis negotiation team van, which is kind of like a converted bread delivery van, somewhere warm for them to be. They're moved slightly off-site, provided cigarettes to smoke, brought back. Ms. Strong is given an opportunity to retrieve keys to go through and open up the property. All this time, the SWAT team is conducting, in essence, what's called a slow search, where they're looking for people, trying to make sure that, in fact, there isn't another individual located there. So Ms. Strong claims that she was in significant pain because of an injury or the surgery that she had to her shoulder. But why isn't there an issue of fact as to whether or not they released her quick enough with that injury to her shoulder? Because even taking it in the light and most favorable to the plaintiff, I mean, under her testimony, she was placed in the handcuffs. It was too tight. She complained about it, and within a few minutes, the handcuffs were loosened. Because I believe, as I understand it, she complained it was not soon enough, that it took a substantial period of time before they released it. I believe that in Mr. Byers' deposition, he states that it was within 20 minutes. What does she say? I'd have to look at that again, Your Honor. But again, at this time, when all of this is occurring, Officer Trotter and Detective Burroughs are off-site. They're not even present to be in any position to intervene if something were to go on. What about, let's take a look at what happened when those motorcycle parts were provided to the officers, and the officers told them, if he didn't turn over those parts, that they would be prosecuted. Why is that consent? So, when you're looking at consent, I think you're looking at the totality of the circumstances. And that essentially involves two different visits to the shop. We have the first visit on the day of the warrant service at the house, where Mr. Byers goes to the shop, cooperates, allows the officers to look around. They locate at that time the items that they determine are contraband and tell him, hey, we think that there's a problem with these engines. That's on January 11th of 2013. Officer Trotter then returns on February 22nd of 2013, knowing that Mr. Byers has consented previously to him being there. They go there during daylight hours when the shop is open. Yeah, he consented to him being there for a variety of reasons. Was it clear to the officers that the parts seized did not belong to Mr. Byers, that they were, in fact, customers' parts? In the light most favorable to the plaintiffs, they provided information about registered owners that weren't Mr. Byers. All right. So what are you relying on to establish apparent consent? If I take my car to the shop, then that means that the shop owner has the apparent authority to consent to seizure by law enforcement without a warrant? What we're relying on is the relationship of a bailee and apparent authority. And then what we're also relying on then is also qualified immunity that a reasonable officer could conclude, based upon the totality of circumstances and conversations that they had, that Mr. Byers had apparent authority to turn over these items, which were contraband. Under Oregon law, a motorcycle part like that that has altered numbers is considered contraband. So it would be as if we showed up and Mr. Byers had cocaine in his office. A little different. It's contraband in the same sense. He's obviously going to say this is not mine. He had, you know, certainly we believe a reasonable officer could have concluded that he had apparent authority to be able to hand that over. In the deposition testimony, Mr. Byers initially couldn't remember being threatened, couldn't remember being threatened. His attorney brings him outside and he came back in and then said this line of if I didn't sign the paperwork that I could go to jail for altering or destroying the numbers. That's that. There was never any prosecution whatsoever, right? So it's not as if, going back to your attempted analogy, it's not as if it was cocaine. So I'm thinking about the apparent authority that you're saying that they had. It doesn't seem like an enormously egregious crime when they never even prosecuted it. Well, the city attorney, or the city prosecutor, excuse me, considered prosecuting that for some time. And that's the reason why there was a delay. The engines were seized on February 22nd of 2013. They were released to the registered owners. We still don't know who the original owners were, but at least the individuals that had these altered items. Since we weren't able to determine who the original owner was, we released them back to them with instructions they be reserialized. And that occurred in September of 2013, shortly after the city prosecutor decided he wasn't going to move forward on prosecution. So they were held as evidence of a crime. Okay. And let's turn back for a second on the reasons why he turned them over to the officers. If you don't turn them over, then you're going to be prosecuted. So how can that possibly be consent? Is there any case law that established that they can essentially . . . First of all, I'm not sure . . . I don't think they could have. He could have been prosecuted. So what's the basis that is a reasonable basis for consent that follows from a statement that is incorrect? Because I don't think that it arises to the level of duress sufficient that an officer couldn't conclude that he had the authority to do that. You're talking about qualified immunity. We're talking about qualified immunity principally on that claim, yes. And again, I'm trying to accept all the facts in the light most favorable to the plaintiff in terms of their version of what they say occurred. The case law that establishes that was reasonable. What is that? The case law that we cited to in our answering brief is what we would rely on about an agent having apparent authority to be able to provide an item that they have joint custody over. And that when you're looking at whether the consent is knowing, voluntary, all of those things, you don't look at just one factor. You look at the totality. And in this instance . . . What are the totality, the undisputed facts that were established? That the officer showed up during daylight hours. Mr. Byers greeted them. They explained why it was they were there. They asked him to sign this release. They apparently made this statement, according to him, about the items being contraband and that he could be prosecuted. He did sign the release. He didn't remember them saying anything else. It was a polite and casual conversation. He went then out, got a dolly, helped them move the items into the back of one of the officers' pickup. He was cooperating throughout this time. And overall, the experience in the shop is not one of the officers pointing guns at him, holding other property of his. Those types of things that I think an officer should have understood would be a situation causing him duress. We have sort of this one statement that attributed to Officer Trotter by the plaintiff. With respect to a couple of the items that the Court identified, the gate in this instance and it being unlocked or what information we have there, it's in Lieutenant Soulsby's declaration at supplemental excerpt of Record 63, where he describes that they didn't know that the gate was locked and their concerns about it opening towards the house. In his declaration at supplemental excerpt of Record 62, he describes why he reasonably believed that Patrick Munson, who was the son they were primarily concerned with, would be located at the property. He had been there less than, I think, two months prior and identified that he was living on a trailer on the property to a Lane County Sheriff's deputy and they had a lot of other contacts with him there. So they reasonably believed that he would be located there and he was the principal individual they were concerned about. So there's nothing that needs to go to the jury about what he said as to what he knew prior to this occurrence? Correct. Yeah. In Lieutenant Soulsby's declaration, he explains the principal factors that he took into account and there's nothing to contradict that the information they had about who they were going to contact in their criminal history. There's nothing to contradict that the officers reasonably believed that Patrick Munson would be found there. There's certainly nothing in that record. And that, in some ways, makes this a very unique excessive force case because nothing was submitted in response to contradict what the officers knew in their planning for the warrant service. So what about that is undisputed in your favor that would establish that exercising or executing the search, in fact, was not in violation of the Constitution? So it's the that, I mean, I think initially what you would point to is they decided to operate on a surrounding call-out, the idea being you have multiple individuals on this property with criminal histories, you have multiple outbuildings, lots of different areas people can be, rather than, but it is a property crime that they are there for. They have these other risks they have to take into account, safety risks they're aware of, and so they go in, they do breach the gate, but they go in and do the surrounding call-out and allow the occupants to come out to them before then beginning their sort of slow search of the property. There certainly is not a case, Bravo v. City of Santa Maria, not similar to this whatsoever. Boyd, again, not similar. Those are cases where officers are entering the house, pointing guns at people's heads, doing more serious things. That's not the place where they could cover the property and all the residents, people could be, but then let them come out so they could be detained and then do the slow search before they handed it over to the detectives so the detectives could complete the investigation. Counsel, what's your response to opposing counsel's position that the district court should have allowed the Doe defendants to be detained? My position is that, I mean, it didn't relate back, and so that it was futile for the reasons that we articulated in the district court and then again here. Mr. Byers was the first one to sue the City of Eugene. He filed his lawsuit, I believe, in the summer of 2013, seeking return of the motorcycle parts, and he was represented by the same group that moved forward with Section 983 claim, and instead they waited until October of 2014 to file their civil rights lawsuit. And then they waited another 120 days to try to seek leave to a man to name the Doe. So why didn't the fact that everyone who was part of the raid, the fact that all of them were listed, why didn't that give adequate notice? So our position is that there wasn't notice to those individuals, and you're looking at it on an individual level, what, I'm going to butcher the name of it, but I think it's Krupski, that Supreme Court case says is you look at the knowledge that the defendant has or the defendant to be added. And our position was that they never provided any notice that a defendant was aware, one of those to be added defendants was aware this action had been followed and that there was no notice. Had been filed. What? Had been followed. Had been filed, that the lawsuit had been filed, or that there had been some mistake in terms of identity, that they'd named John Doe mistakenly, not understanding that they really should have named the individual officer. They could have named all those people individually at the beginning for whatever reason they decided not to. They could have filed it earlier on and done discovery within the statute of limitations. But my question was, if everyone who participated was listed, why wasn't that notice to them? Because the complaint itself describes a lot of actions that Trotter, Burroughs and Soulsby took, and so if you're looking at the actions that are described within the complaint itself, it is describing actions that those individuals took. So you wouldn't make a mistake in thinking that, oh, they're blaming Lieutenant Soulsby for this when really I did it, because they're actions that he took. The other piece of it is that, again, within that 120-day period after the filing of the complaint, there's no indication within the record that any of those individuals to be added received any type of notice about the complaint. This isn't a case where, for instance, the city attorney represented those individuals that they were provided with the complaint anything. So it's your representation that those individuals never received a copy of the complaint even though they were listed as having participated in the proceeding? Correct. Or the amended complaint. Correct. When is a SWAT team inappropriate? And why wasn't it inappropriate here? So it, I mean, I'll fall back on the totality of circumstances. I mean, we look under the gram factors to make that determination as to when it can be excessive. And I would point the Court to the cases like Bravo, the city of Santa Maria. There you have issues related to sort of a warrant that was likely invalid and information that wasn't provided. And the officers then going in very aggressively pointing guns at people, deploying flashbangs during instances where they're not looking to where they're going, things that put individuals at risk. It's going to be a case-by-case determination. And in this instance, you know, a reasonable officer What do we have to support the SWAT team, so to speak? Yeah. What we have is the risks to Patrick Munson and then the officers doing, posed by Patrick Munson principally, the other factors that Lieutenant Soule would have articulated. And then what we have is them doing sort of a modified warrant service. And I certainly have looked and haven't found a case from the Ninth Circuit that deals with the surround and call-out response, saying that, you know, this is per se excessive. Yes, you know, they were there interested in principally property crime, theft one. It's a Class C felony. But they have legitimate safety concerns that they need to address to make sure that before they hand it over to the detectives, that they're going to be safe, the occupants are going to be safe, and we can get in there now. Is there any disputed fact regarding those dangers, the individual in particular, whether or not he was actually dangerous? I've heard counsel say that he hadn't been there for a while. But the officers, did they know that? No. No, they reasonably believed he was there, and that's on Lieutenant Soulsby's declaration at SCR 63, and he explains the reasons why. I mean, there's I think four prior contacts of him there, including one about two months before the warrant service. So thank you. Thank you, counsel. One minute for rebuttal. Thank you, Your Honors. On the property damage issue, the U.S. Feedbacker case specifically addressed the use of SWAT without prior announcement, and specifically in the context of property destruction, and said that citing, looking at Mendoza, that there's no justification for property damage, where the information was there was a prior conviction for armed robbery and the inherently dangerous job of arresting drug dealers. Those weren't enough to allow the officers to just immediately destroy property during a SWAT raid. On the seizure of property of the non-residents, there's a question of fact regarding whether the length of time the property was held was valid. The property was seized February 2013. The prosecutor released it June of 2013, and it was not returned until September of 2013. So there was even a three-month delay after the prosecutor released the property. On the amendment issue, I think that's addressed fully in the brief, but I just want to point out that, again, paragraph 11 of the complaint, which is ER 31 to 32, specifically puts those listed officers on notice that they might be, they might have participated in the handcuffing or allowing the handcuffing to last unnecessarily long or property destruction. So that might be true if they had been served with the complaint. But opposing counsel says that they never received the complaint. So how could they be on notice? The relation back statute doesn't require service. It requires notice. How was there notice? The officers who were still employed by the city clearly should have been notified if the city was served with this very detailed list of officers that were involved in the SWAT raid. So thank you, Your Honor. Thank you, counsel. Thank you to both counsel for your helpful arguments.
judges: Rawlinson, Nguyen, Silver